Ancel Vincent **ELCOCK,** Petitioner,

v.

**UNITED STATES of America,** Respondent.

**Civil Action No. CV–99–1757 (DGT).**

United States District Court, E.D. New York.

Jan. 26, 2000.

Abraham L. Clott, The Legal Aid Society, Federal Defender Div., Eastern District of New York, Brooklyn, NY, for Petitioner.

Loretta E. Lynch, U.S. Attorney, Dwight C. Holton, Assistant U.S. States Attorney (Of Counsel) Eastern District of New York, U.S. Attorney's Office, Brooklyn, NY, for Respondent.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Ancel Vincent Elcock ("Elcock") petitions this court for a writ of habeas corpus barring his extradition to the Federal Republic of Germany ("Germany") to face bank robbery charges. Elcock, who has previously been convicted of related charges in the Eastern District of New York, argues that this extradition would violate the prior jeopardy provision of the extradition treaty between the United States and Germany.

### Background

#### (1)

The background facts of this case appear to be as follows:[1] on Friday, August 29, 1997, Elcock, together with a German accomplice, Claudia Conradus ("Conradus"), stole $419,720 in various national currencies from a bank in Berlin, Germany. Conradus, who was Elcock's girlfriend and an employee of the bank, assisted Elcock by obtaining the combination to the bank's safe, as well as a set of keys necessary to access the vault. Conradus then went to the bank with Elcock, and together they stole the currency.

After committing the theft, Elcock and Conradus returned to Conradus' apartment, where they concealed the money in a hollowed-out teddy bear and three empty puzzle boxes. The couple then bundled the teddy bear and three boxes in a single package and addressed the package to Elcock's sister in the United States. The package was labeled with a fictitious return address and the phrase "Happy Birthday."

Elcock mailed the package containing the stolen money to his sister in the United States the next day, a Saturday. On Sunday, Elcock flew back to the United States and moved in with his sister in order to intercept the package. When the bank reopened on Monday, bank officials discovered the theft, and later that day, Conradus was arrested for her role in the theft.[2]

One week later, on September 8, 1997, the package arrived at the mail facility at John F. Kennedy International Airport. During a routine X-ray of the package, agents of the United States Customs Service detected the stolen currency. On September 22, 1997, Customs agents made a controlled delivery of the package to Elcock's sister's address. Elcock accepted delivery of the package, tore open the teddy bear, and was arrested immediately thereafter.

#### (2)

Following his arrest, Elcock was indicted and tried before this court on charges of transporting stolen currency in foreign commerce, 18 U.S.C. § 2314 (Supp.1999)

---

1. To the extent that this opinion refers to matters outside the trial record, it is based on the Presentence Investigative Report prepared by the probation department in connection with Elcock's criminal prosecution.

2. After Conradus pleaded guilty to a charge of theft, the district court in Berlin sentenced her to serve 30 months in custody.

(Count One),[3] receipt and possession of stolen currency, 18 U.S.C. § 2315 (Supp. 1999) (Count Two),[4] and smuggling stolen currency into the United States, 18 U.S.C. § 545 (Supp.1999) (Count Three).[5] *See United States v. Elcock*, No. 97–CR–992 (DGT) (E.D.N.Y.) (superceding indictment). At the close of trial on April 3, 1998, a jury found Elcock guilty of Counts One and Three—transporting stolen currency in foreign commerce and smuggling the currency into the United States, but did not return a verdict on Count Two—receiving and possessing stolen currency.[6]

On July 2, 1998, Elcock was sentenced by this court. Elcock objected to portions of the presentence investigative report which outlined Elcock's role in the theft of funds from the bank in Germany. Elcock's objections were rejected on the ground that there was sufficient evidence to conclude that Elcock had taken part in the theft. Moreover, because Elcock had engaged in a "very clever scheme," *United States v.Elcock*, No. 97–CR–992 (E.D.N.Y. July 2, 1998) (transcript of sentencing at

6), Elcock's sentence was enhanced by two levels for more than minimal planning. Ultimately, Elcock received a sentence of thirty months in prison.

On July 7, 1998, Elcock filed a notice of appeal in the Second Circuit challenging the propriety of the upward departure for more than minimal planning. The Second Circuit rejected Elcock's appeal on March 15, 1999. *See United States v. Elcock*, No. 98–1478, 1999 WL 147035 (2d Cir. Mar. 15, 1999) (summary order affirming sentence).

Elcock is currently serving the final week of his sentence and is due to be released on January 29, 2000.

### (3)

While Elcock was being prosecuted in the United States, extradition proceedings were commenced in this court. On September 17, 1997, a German district court in Berlin–Tiergarten issued an arrest warrant for Elcock charging him with grand larceny and conspiracy to commit grand larceny in violation of German Crim.Code §§ 25(2), 242(1), 243(1)(2).[7] At Germany's

---

3. Section 2314 provides, in pertinent part:
 > Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined under this title or imprisoned not more than ten years, or both.

4. Section 2315 provides, in pertinent part:
 > Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any ... money of the value of $5,000 or more ... which [has] crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ... [s]hall be fined under this title or imprisoned not more than ten years, or both.

5. Section 545 provides, in pertinent part:
 > Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives ... such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law ... [s]hall be find under this title or

imprisoned not more than five years, or both.

6. This peculiar result is probably explained by the following. Pursuant to a misguided departmental policy, customs officials removed all the stolen currency from the package and substituted paper for the banknotes rather than leaving a few of the stolen banknotes in the package. As a result, the jury apparently concluded that Elcock never received or possessed stolen currency but instead received and possessed nothing more than a package stuffed with paper.

7. German authorities provided the following certified translation of the relevant code sections as part their extradition request:
 > § 25 Preparation of an offense
 > ...
 > (2) [I]f several persons commit a crime jointly, then
 > § 242 Theft
 > (1) Whosoever takes the personal property of another with the intent of illegally appropriating such property will be sentenced to a fine or a prison term of up to five years.
 >
 > . . . . .
 >
 > § 243 Grand Larceny

request, the United States filed an extradition complaint against Elcock on November 25, 1997. On February 2, 1998, documents prepared by the Federal Republic of Germany in support of the extradition were certified by an official at the United States Embassy in Germany. An extradition hearing was held, and on February 10, 1998, Magistrate Judge Robert M. Levy issued a Certification and Order certifying the matter to the Secretary of State.

On March 29, 1999, Elcock filed this petition for a writ of habeas corpus blocking his extradition. Elcock argues that because of his American prosecution, his extradition is barred by the prior jeopardy provision of the extradition treaty between the United States and Germany.

## Discussion

### (1)

### Elcock's American Prosecution does not Bar his Extradition.

■■■ The Fifth Amendment's protection against double jeopardy extends only to successive prosecutions brought by the same sovereign. *See Abbate v. United States,* 359 U.S. 187, 193–195, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959) (enunciating separate sovereign theory of double jeopardy); *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922) (same); *Moore v. Illinois,* 55 U.S. (14 How.) 13, 19–20, 14 L.Ed. 306 (1852) (same). As a result, the Double Jeopardy Clause of the Constitution does not prevent extradition from the United States for the purpose of a foreign prosecution following prosecution in the United States for the same offense. *See In re Ryan,* 360 F.Supp. 270, 274 (E.D.N.Y.), *aff'd,* 478 F.2d 1397 (2d Cir.1973) (Table). The principle of double jeopardy, or *non bis in dem*[8] as the concept is more commonly known in civil law, is, however, an internationally recognized principle of criminal justice. *See Sindona v. Grant,* 619 F.2d 167, 177 (2d Cir.1980) (Friendly, J.); M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 598 (3d rev. ed.1996) [hereinafter Bassiouni, *International Extradition*]. As such, many extradition treaties—including virtually all of the United States' extradition treaties negotiated since World War II—contain provisions on double jeopardy. *See Sindona,* 619 F.2d at 177 (citing numerous examples); 4 Michael Abbell & Bruno A. Ristau, *International Judicial Assistance* 109 (1990 & Supp.1997).

At issue here is the interpretation of Article 8 ("Prior Jeopardy for the Same Offense") of the Treaty Between the United States of America and the Federal Republic of Germany Concerning Extradition, June 20, 1978, U.S.-F.R.G., 32 U.S.T. 1485 [hereinafter Treaty or Article 8], which provides:

> Extradition shall not be granted when the person whose extradition is requested has been tried and discharged or punished with final and binding effect by the competent authorities of the Requested State for the offense for which his extradition is requested.

The principal question on this petition is whether the American prosecution for transporting, smuggling, and receiving stolen currency and the German charges on the underlying bank robbery constitute sequential prosecutions for the same "offense" within the meaning of the Treaty.

---

(1) [I]n especially aggravated cases, theft will be punished by a prison term of three months to ten years. As a rule, an especially aggravated case is deemed present when the offender

. . . . .

2. steals an item which is protected in a special manner against removal by a locked container or by another protective device.

. . . . .

8. The term is derived from the Roman law maxim *"Nemo bis in idem debet vexari"* ("No one should be vexed twice for one and the same cause"). *See Sindona,* 619 F.2d at 177.

## A. The Government's Argument

Relying in part on Judge Friendly's opinion in *Sindona v. Grant,* 619 F.2d 167 (2d Cir.1980), the Government urges that Article 8 should be interpreted solely in light of the domestic law of double jeopardy and that this court should apply the *Blockburger* or "same elements" test to determine whether the German charges concern the same offense as the charges for which Elcock has been prosecuted in the United States. *See* Resp't's Mem. Opp. at 5, 8–9. *See generally United States v. Dixon,* 509 U.S. 688, 703–12, 113 S.Ct. 2849, 2859–64, 125 L.Ed.2d 556 (1993) (adopting *Blockburger* as the exclusive test for determining whether multiple prosecutions violate the Double Jeopardy Clause); *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932) (holding that two crimes constitute different "offences" within the meaning of the Double Jeopardy Clause if each "requires proof of an additional fact which the other does not").

In *Sindona,* Judge Friendly was required to construe the prior jeopardy clause of the United States' then-current extradition treaty with Italy. In language close to that of Article 8, the treaty with Italy barred extradition in cases where the "person whose surrender is sought is being proceeded against or has been tried and discharged or punished in the territory of the requested Party for the offense for which his extradition is requested." Treaty on Extradition, Jan. 18, 1973, U.S.-Italy, art. VI(1), 26 U.S.T. 493 (superceded by Treaty on Extradition, Oct. 13, 1983, U.S.-Italy, T.I.A.S. No. 10,837). Italy had requested Sindona's extradition to face charges of fraudulent bankruptcy in Italy following his prosecution in the United States for securities fraud and other securities law offenses. Rejecting *Blockburger* as too narrow a test for determining identity of "offenses" within the meaning of the

treaty, Judge Friendly instead looked for guidance in Justice Brennan's concurring opinion in *Ashe v. Swenson,* 397 U.S. 436, 453–54, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring) (stating that the Double Jeopardy Clause requires joinder of "all the charges against a defendant which grow out of a single criminal act, occurrence, episode or transaction") and the Department of Justice's (then-current) *Petite* [9] policy, *see* United States Attorneys' Manual § 9–2.142 (n.d.) (barring federal prosecutors from trying a case where there has been a state prosecution for "substantially the same act or acts" unless there are "compelling Federal interests for such prosecution"), *quoted in Sindona,* 619 F.2d at 178. *See Sindona,* 619 F.2d at 178–79. Applying these principles, Judge Friendly determined that the Italian charges against Sindona did not involve the same "offense" as did his American prosecution.

Although Judge Friendly's opinion has sometimes been cited for the proposition that domestic law should be applied to determine the effect of a double jeopardy clause in an extradition treaty, *see, e.g., United States v. Jurado–Rodriguez,* 907 F.Supp. 568, 577–78 (E.D.N.Y.1995), such a view may well represent a misreading of the opinion. The passage in *Sindona* generally cited for the proposition that recourse to domestic law is appropriate in these cases is not actually a holding or even dictum of the court. Rather, it is a paraphrase of a descriptive observation by a commentator:

> Perhaps because of the diverse origins of the rule ... no established solution exists for the famous problem of identity of offenses for application of *non bis in idem.* ... Thus, he [commentator M. Cherif Bassiouni] *observes,* the scope of any given double jeopardy provision will hinge in large part on the interpretations given these terms that are bor-

---

**9.** *See Petite v. United States,* 361 U.S. 529, 530–31, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960).

rowed from the domestic law and policies of the contracting parties.

*Sindona,* 619 F.2d at 177 (citing M. Cherif Bassiouni, *International Extradition and World Public Order* 459 (1974) [hereinafter Bassiouni, *World Public Order* ] ) (internal quotations and other citations omitted) (second emphasis added). Nowhere in the opinion does Judge Friendly expressly endorse the observation as a normative principle. On the contrary, Judge Friendly subsequently cautioned that:

> [I]n construing a double jeopardy clause in a treaty, embodying an ancient and widely recognized principle of civilized conduct, a court should not deem itself bound by a quiddity of the law of the requested party.

*Sindona,* 619 F.2d at 178. Although Judge Friendly did ultimately look to domestic principles—Justice Brennan's concurring opinion in *Ashe v. Swenson* and the Department of Justice's *Petite* policy—in deciding the scope of the double jeopardy protection in *Sindona,* he did so simply to find a familiar standard that was broad enough to capture what he saw as the most likely understanding of the principle in the international law context. Far from being a ringing endorsement of the application of domestic law, Judge Friendly's *Sindona* opinion appears instead to be a qualified acceptance of domestic law as a second-best solution to the difficult problem of applying a transnational legal concept whose precise meaning is not fixed by international law. *See In the Matter of the Extradition of Montiel Garcia,* 802 F.Supp. 773, 778 (E.D.N.Y.1992) (commenting that *Sindona* "recognized the need for some reference to domestic law *in light of the absence of international agreement on the scope of the concept* " (emphasis added)), *aff'd,* 987 F.2d 153 (2d Cir. 1993) (per curiam). It is, therefore, a distortion of Judge Friendly's reasoning to suggest that he concluded that extradition treaties should, in the first instance, be interpreted in light of domestic law, and then to argue that if Judge Friendly had had the benefit of the Supreme Court's later opinion in *Dixon,* he would have necessarily applied the *Blockburger* test to Sindona's extradition. *See* Resp't's Mem. Opp. at 5, 8–9.

▆▆▆▆ Had the parties intended that each would apply its own law in determining whether the requested extradition would violate double jeopardy principles, they could have clearly stated as much. The 1972 extradition treaty between the United States and the United Kingdom, for instance, provides:

> Extradition shall not be granted if: (a) the person sought would, if proceeded against in the territory of the requested Party for the offense for which his extradition is requested, be entitled to be discharged on the grounds of a previous acquittal or conviction in the territory of the requesting or requested Party or of a third State. . . .

Treaty on Extradition, June 8, 1972, U.S.-U.K., art. V(1), 28 U.S.T. 277. *See generally Gusikoff v. United States,* 620 F.2d 459, 463–64 (5th Cir.1980) (applying Article V(1)(a) of the U.S.-U.K. treaty). In the absence of such a provision, a court may not simply rely on the meanings the terms of the treaty have in the context of domestic law.[10] Lest the true import of a treaty

---

10. Article 27 of the Treaty cannot be construed to have the same effect as Article V of the U.S.-U.K. treaty. Article 27 provides: "Except where this Treaty provides, the law of the Requested State shall be applicable with respect to provisional arrest, extradition and transit." Article 27's reference to the "law of the Requested State" in connection with "extradition" might be read to suggest that the Treaty incorporates the substantive domestic law of the Requested State into the extradition provisions of the Treaty, including Article 8. Three considerations defeat such a reading.

First, in his Letter of Submittal to the President, the Secretary of State recounted the Department of State's understanding of the terms of the Treaty. In the letter, the Secretary of State relates that "Articles 14–30 outline the *procedures* by which extradition shall be accomplished." Letter from Secretary of State Warren Christopher to the President of

provision be lost in the translation, a court must first turn to established principles of treaty interpretation to discern the meanings of those terms as they are used in the treaty.

## B. Principles of Treaty Construction

 Interpretation of a treaty must begin with the language of the treaty itself. *See Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982). Because a treaty is essentially a contract between two nations, *see Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 533, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461 (1987); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829) (Marshall, C.J.), "it is [a construing court's]

responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties," *Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 1342, 84 L.Ed.2d 289 (1985); *see* Restatement (Third) of the Foreign Relations Law of the United States § 325 reporters' note 4 (1987) (noting that for United States courts "the primary object of interpretation is to 'ascertain the meaning intended by the parties'" (quoting Restatement (Second) of the Foreign Relations Law of the United States §§ 146–147 (1965))) [hereinafter Restatement (Third)]. In determining the intended meaning of the parties, a court may look to a treaty's negotiating and drafting history (*travaux preparatoires*), *see El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S.

10/16/78 (emphasis added), *reprinted in* Treaty Concerning Extradition, June 20, 1978, U.S.-F.R.G., S. Exec. Rep. No. 96–20 (1979). The Secretary of State's comment signals that Article 27 was meant only to clarify that extradition is to proceed in each country according to the procedures fixed by that country's laws; in the United States, the relevant "law ... applicable with respect to ... extradition" would be 18 U.S.C. §§ 3181–3196 (1985 & Supp.1999) and the law of habeas corpus. Indeed, were Article 27 intended to incorporate substantive domestic law into the terms of the Treaty, one would expect that a more explicit statement of that principle would have been used, such as that found in Article V of the U.S.-U.K. extradition treaty.

Second, United States courts have consistently ruled that similar provisions in other treaties do not import substantive constitutional or statutory protections into the extradition context. *See Murphy v. United States*, 199 F.3d 599, 602 (2d Cir.1999) (Article 8 of extradition treaty with Canada which provides that the "determination that extradition should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use all remedies and recourses provided by such law" does not make violation of domestic statutes of limitation a ground for denying an extradition request); *Martin v. Warden, Atlanta Pen*, 993 F.2d 824, 829 (11th Cir.1993) (Article 8 of extradition treaty with Canada did not make the constitutional guarantees of due process and a speedy trial grounds for

preventing extradition); *In re Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir.1986) (same holding with respect to substantially identical clause in extradition treaty with Argentina); *Kamrin v. United States*, 725 F.2d 1225, 1227–28 (9th Cir.1984) (same) (Australia).

Third, a similar provision in the European Convention on Extradition, Dec. 13, 1957, 359 U.N.T.S. 273, which predates the Treaty and to which Germany is a signatory, expressly states that the provision governs only the procedural aspects of extradition: "Except where this Convention otherwise provides, the procedure with regard to extradition and provisional arrest shall be governed solely by the law of the requested Party." *Id.* art. 22 ("Procedure"). To the extent that the United States and Germany understood Article 27 of the Treaty to operate in a similar fashion, the European Convention's choice of law provision *militates against a substantive reading of* Article 27.

Notably, in *Sindona*, the Government argued that a substantially identical clause in the treaty there under consideration required that the determination whether two "offenses" are the same be made in accordance with domestic double jeopardy law. *See Sindona*, 619 F.2d at 178. Although Judge Friendly never expressly rejected nor endorsed this reading of the clause, his remark that "a court should not deem itself bound by a quiddity of the law of the requested party" would seem to be an implicit rejection of a reading of the clause that would require an extradition court to apply domestic double jeopardy law. *Id.* at 178.

155, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999); *Saks,* 470 U.S. at 400, 105 S. Ct. at 1343, as well as the subsequent practice of the parties in their application of the treaty, *see* Restatement (Third) § 325(2) & cmt. c.

■ In this light, Senate preratification debates and reports are a proper interpretive guide, *see United States v. Stuart,* 489 U.S. 353, 367 n. 7, 109 S.Ct. 1183, 1191 n. 7, 103 L.Ed.2d 388 (1989); Restatement (Third) § 314 cmt. d, § 326 reporters' note 2, though interpretations placed on a treaty by the Senate after the Senate gives its consent to the treaty have "no special authority," Restatement (Third) § 326 reporters' note 1 (citing *Fourteen Diamond Rings v. United States,* 183 U.S. 176, 180, 22 S.Ct. 59, 60, 46 L.Ed. 138 (1901) ("The meaning of the treaty cannot be controlled by subsequent explanations of some of those who may have voted to ratify it.")).

■ In addition, because treaty construction implicates questions of foreign policy, *see United States v. Kin–Hong,* 110 F.3d 103, 110 (1st Cir.1997), the executive branch's construction of a treaty, although not binding on the courts, is entitled to great weight, *see Factor v. Laubenheimer,* 290 U.S. 276, 295, 54 S.Ct. 191, 196, 78 L.Ed. 315 (1933); *Charlton v. Kelly,* 229 U.S. 447, 468, 33 S.Ct. 945, 952, 57 L.Ed. 1274 (1913); Restatement (Third) § 326(2) & reporters' note 2.

■ Finally, construction of an extradition treaty is also guided by the " ' "familiar rule that the obligations of treaty should be liberally construed" ' to effect their purpose, namely, the surrender of fugitives to be tried for their alleged offenses." *Ludecke v. U.S. Marshal,* 15 F.3d 496, 498 (5th Cir.1994) (quoting *Escobedo v. United States,* 623 F.2d 1098, 1104 (5th Cir.1980) (quoting *Valentine v. United States ex rel. Neidecker,* 299 U.S. 5, 10, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936))); *accord*

*United States v. Cancino–Perez,* 151 F.R.D. 521, 523 (E.D.N.Y.1993); *see also Factor,* 290 U.S. at 293–94, 54 S.Ct. at 196 ("[I]f a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred."). "The obligation to do what some nations have done voluntarily, in the interest of justice and friendly international relationships … should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor,* 290 U.S. at 298–99, 54 S.Ct. at 197 (citations omitted).

### C. *Non Bis In Idem*

■ Although double jeopardy is a widely accepted principle of criminal justice with roots in Roman law, *see Bartkus v. Illinois,* 359 U.S. 121, 151–55, 79 S.Ct. 676, 695–97, 3 L.Ed.2d 684 (1959) (Black, J., dissenting); *Sindona,* 619 F.2d at 177; M. Cherif Bassiouni, *International Extradition: United States Law and Practice* 598 (3d rev. ed.1996) [hereinafter Bassiouni, *International Extradition* ]; Jay A. Sigler, *Double Jeopardy: The Development of a Legal and Social Policy* 120–21 (1969), there is no international consensus on its precise meaning or the general rules governing its application to particular cases, *see Sindona,* 619 F.2d at 177; *Montiel Garcia,* 802 F.Supp. at 778; Bassiouni, *International Extradition, supra,* at 598–600; 2 M. Cherif Bassiouni & Ved P. Nanda, *Treatise on International Criminal Law* § 7.9, at 273 (1973). Although it appears relatively clear that use of the term "same acts" in a *non bis in idem* clause [11] confers broader protection against . extradition than a clause that uses the term "same offense" (as does Article 8 and the *non bis in idem* clauses in most United States extradition treaties), *see Sindona,* 619 F.2d at 177; 4 Abbell & Ristau, *supra,* at 110–11, 215–216, 320; Bassiouni, *Inter-*

---

11. *See* Extradition Convention, Jan. 6, 1909, U.S.-Fr., art. VIII, 37 Stat. 1526 (using term "same act"); Treaty on Extradition, Oct. 13, 1983, U.S.-Italy, art. VI, T.I.A.S. No. 10,837 (using term "same acts").

*national Extradition, supra,* at 600, little more can be said with certainty other than that a *non bis in idem* clause is more likely to be applied "when the requested state has already commenced prosecution for 'the same, meaning identical, conduct,'" *Sindona,* 619 F.2d at 177 (quoting Bassiouni, *World Public Order, supra,* at 455–56). As Professor Cherif Bassiouni [12] has noted, the term "same offense" could plausibly be interpreted to mean anything from "identical charge," to "lesser included offense," to "related offenses, but not included." Bassiouni, *International Extradition, supra,* at 602. *See generally* 4 Abbell & Ristau, *supra,* at 109–11, 214–16, 320 (discussing judicial uncertainty over the scope of *non bis in idem* clauses); Bassiouni, *International Extradition, supra,* at 605–07 (same).

Given the absence of any generally recognized meaning for the term "offense" in international law, it is necessary to determine by reference to *travaux preparatoires* and other sources what subjective meaning the United States and Germany mutually attached to the term, if any. Unfortunately, the Senate executive report accompanying this Treaty has nothing to say on the subject, *see* Treaty Concerning Extradition, June 20, 1978, U.S.-F.R.G., S. Exec. Rep. No. 96–20 (1979), and the Department of Justice's Office of International Affairs ("OIA") has indicated that no other *travaux* are available, *see* Letter from Assistant U.S. Attorney Dwight C. Holton to Chambers of 9/30/99, at 1.

The Department of State, however, has long taken the position that the term "offense" encompasses only crimes whose elements are identical and crimes that constitute lesser included offenses. In a technical analysis submitted to the Senate Committee on Foreign Relations in connection with its consideration of the 1983 extradition treaty with Thailand, the De-

partments of State and Justice offered the following explanation of that treaty's "offense"-based double jeopardy clause:

> [The Thai treaty provision] follows standard United States extradition practice by prohibiting extradition when the person sought has been convicted or acquitted in the requested country of the offense for which extradition is requested. This language was drafted narrowly to ensure that extradition is barred by this provision only in cases where the offense charged in each country is the same. Thus, a person convicted in Thailand for illegal possession and export of narcotics from Thailand could still be prosecuted in the United States for importing and conspiring to import narcotics—while the acts are the same, the offenses are different.

Treaty Relating to Extradition, Dec. 14, 1983, U.S.-Thail., S. Exec. Rep. No. 98–29, at 4 (1984), *reprinted in* 2 Igor I. Kavass & Adolf Sprudzs, *Extradition Laws and Treaties: United States* 880.11, 880.14 (Supp.1998).

Similarly, the Department of State technical analysis submitted to the Senate in connection with the 1994 extradition treaty with the Philippines clarifies that an "offense"-based double jeopardy clause

> applies only when the person sought has been convicted or acquitted in the Requested State of *exactly the same crime that is charged in the Requesting State. It is not enough that the same facts were involved.* Thus, if the person sought is accused by one Contracting Party of illegally smuggling narcotics into that country, and is charged by the other Contracting Party with unlawfully exporting *the same shipment of drugs,* an acquittal or conviction in one Contracting Party does not insulate that person

---

**12.** Professor Bassiouni is a professor of law at DePaul University in Chicago, Illinois, and president of both the International Institute of Higher Studies in Criminal Sciences at Siracusa, Italy, and the Association Internationale de Droit Pénal. He is a leading scholar in the area of international criminal law and has authored the standard treatise on international extradition, Bassiouni, *International Extradition, supra.*

from extradition because different crimes are involved.

Extradition Treaty, Nov. 13, 1994, U.S.-Phil., S. Exec. Rep. No. 104–29, at 10–11 (1996), *reprinted in* 2 Kavass & Sprudzs, *supra,* at 715.31, 715.40–715.41 (emphasis added); *accord* Extradition Treaty, Mar. 28, 1995, U.S.-Jordan, S. Exec. Rep. No. 104–2, at 8–9 (1995), *reprinted in* 1 Kavass & Sprudzs, *supra,* at 475.30, 475.37–475.38 (same); *cf.* Treaty on Extradition, Dec. 4, 1982, U.S.-Costa Rica (not yet in force), S. Exec. Rep No. 98–30, at 5 (1979), *reprinted in* 1 Kavass & Sprudzs, *supra,* at 160.13, 160.17 (construing double jeopardy provision that bars extradition for the "the same offense arising out of the same acts for which extradition is requested" in accordance with *Blockburger* and stating that "a person in the United States who counterfeits Costa Rican currency with the intent to commit a fraud against persons in the United States could be prosecuted for fraud in the United States and then extradited to Costa Rica for prosecution for counterfeiting").

To the extent that this court has been able to discover,[13] Germany most likely places a broader interpretation on the principle of *non bis in idem* than the United States places on double jeopardy. In the German domestic context, the principle of *non bis in idem* is embodied by Article 103(3) of the German Constitution (*Grundgesetz,* or "Basic Law"), which pro-

hibits multiple prosecutions for the same act (*"Tat"*). In an effort to determine the meaning of *Tat* in German law, this court was referred to Professor Markus Dubber of the State University of New York at Buffalo.[14] In correspondence with chambers, Professor Dubber explained that a *Tat* is a "historical occurrence that, according to general life experience, counts as a single act." Letter from Professor Dubber to Chambers of 12/9/99 (citing German Crim. Proc.Code (*StPO* ) § 264; Claus Roxin, *Strafverfahrensrecht* 132, 356 (23d ed.1993); Maunz–Dürig, *Grundgesetz: Kommentar,* art. 103(3), at 13–16 (1993)). Thus, according to Professor Dubber, in Germany "[t]he focus [of the *non bis in idem* inquiry] is on the facts underlying the original prosecution, rather than the elements of the offense." *Id.*; *see also* Bassiouni, *International Extradition, supra,* at 600–01 (stating that "the Civilist concept of *non bis in idem* is not only broader than double jeopardy, but it is also based on the prohibition of prosecution for the same facts, and not only for the same or substantially the same crimes arising out of the same facts").[15]

As part of its inquiry, this court also requested that the U.S. Attorney's Office contact the Office of International Affairs regarding any information the OIA might have on the German interpretation of *non bis in idem.* In response, the OIA con-

---

**13.** *See generally* Restatement (Third) § 325 reporters' note 3 ("Ascertaining state interpretive practice may present difficult problems of research.").

**14.** Professor Dubber serves as the director of the Buffalo Criminal Law Center and as the editor of the *Buffalo Criminal Law Review,* and has authored numerous articles on comparative criminal law, with an emphasis on German law.

**15.** The reason for the civil system's broad conception of *non bis in idem* as compared with our narrow understanding of double jeopardy presents an interesting question of comparative law but is beyond the scope of this opinion. Nonetheless, at least a partial explanation may well lie in the fact that the civil law generally permits the prosecutor a

right to appeal erroneous trial court decisions, while in our system, the finality of a jury verdict of acquittal makes such an appeal impossible—even where the acquittal results from trial court error. The narrow scope of protection from multiple prosecution in our system may thus be seen as a means of limiting the harm to public safety that may result from the impossibility of correcting trial court errors that were favorable to an acquitted defendant. In contrast, because the civil law confers on its prosecutors a full and fair opportunity to prove their cases, it makes sense that the civil law prosecutor is substantially limited to a single set of proceedings in which he or she must prove all crimes arising out of a given criminal transaction.

tacted the German Ministry of Justice, which referred the OIA to an annotation of German Crim. Proc.Code § 264. The OIA translation of the annotation reads, in relevant part:

> In a procedural sense, the offense is the subject matter of the criminal proceedings against an accused. The definition of the term of the offense in § 264 is the same as in Art. 103 III GG [*Grundgesetz* ].
>
> \* \* \* \* \* \*
>
> In a narrower sense, a "specific occurrence" is a standard historical event which differs from other occurrences that are similar or of the same type and within which the accused realized or allegedly realized the criminal elements of an offense. *This includes* (regardless of whether, from a pertinent legal perspective, a concurrence of offenses or an accumulation of offenses are present) *the overall behavior of the perpetrator to the extent that, from a natural standpoint, it represents a pertinent life occurrence. The determining factor is whether a close factual connection exists.* ... [I]n the event of a close spatial and temporal association, only one offense will be present in a procedural sense if the perpetrator was involved either in a robbery or a fraud or if he only became guilty of receiving stolen property when the loot was distributed. However, conversely, if the charges amount to receiving stolen property, a procedural offense with the preceding robbery cannot be assumed in accordance with the law. ... *[A] standard way of looking at these cases is neither possible nor indicated.* There is no consistency if the rulings of the BGH [Federal Supreme Court] are in all cases .based on one offense if the perpetrator either is guilty of a larceny or receiving stolen goods: Even in these situations, it depends on whether the two offenses form a unitary chronological event where the time of the offense, the place of the commission of the of-fense, the object of the offense and the elements of the offense are concerned.

Letter from Assistant U.S. Attorney Dwight C. Holton to Chambers of 9/30/99, enclosure at 1019–20 (citations omitted) (emphasis added). Although rather cryptic, the annotation appears to confirm Professor Dubber's explanation of the German understanding of "offense" as a broader and more fact intensive concept than that defined in *Blockburger.*

If German domestic law is any guide to that country's understanding of *non bis in idem* in the context of international extradition, then it may be that the United States and Germany simply did not have a shared understanding of the term "offense" when they entered into the Treaty.

### D. The Conflict Must be Resolved in Favor of the Department of State's Interpretation.

 Were this an ordinary contract action, the court could potentially find that no contract had been formed between the United States and Germany because there was no meeting of the minds as to the meaning of Article 8—assuming, of course, that the parties did not know, or had no reason to know, of the difference in the meanings they ascribed to the provision. *See Oswald v. Allen,* 417 F.2d 43, 45 (2d Cir.1969); *Raffles v. Winchelhaus,* 2 Hurl. & C. 906, 159 Eng. Rep. 375 (Ex. 1864); Restatement (Second) of Contracts § 20(1)(a) (1981). In this case, the latter assumption would be unwarranted. The fact that different nations have placed very different interpretations upon the principle of *non bis in idem* had been widely recognized by commentators at the time the Treaty was negotiated and signed, *see, e.g.,* 2 Bassiouni & Nanda, *supra* § 7.9, at 273, and both the United States and Germany must be charged with constructive knowledge that the principle has a different scope in their respective legal systems. Under hornbook contracts principles, these circumstances are equally fatal to the formation of a contract: If each party knows

or has reason to know that the other party attaches a different meaning to the contract's terms, both parties are equally at fault, and no contract is formed. *See* Restatement (Second) of Contracts § 20(1)(b) & cmt. d (1981). A federal district court cannot, however, declare a treaty signed by the President and ratified by the Senate void on the ground that there was no *consensus ad idem* between the contracting parties.[16] It is necessary, therefore, to turn away from contract principles in discerning the meaning of Article 8.

■ The remaining principles of treaty construction applicable in the extradition context—deference to executive branch interpretations and the preference for constructions that promote extradition—both support adoption of the *Blockburger* test. First, as previously noted, *supra* § 1(C), the Department of State has clearly expressed its view that "offense"—based double jeopardy provisions such as Article 8 apply only where the elements of the crimes charged in the domestic prosecution and the extradition request are the same, regardless of whether the underlying facts are the same. Second, because *Blockburger* affords a narrower protection than the civil law concept of *non bis in idem*, or any of the other tests discussed in the case law (such as Justice Brennan's "same episode or transaction" test), it will permit extradition more readily than any other viable interpretation of Article 8, and, as such, is to be preferred under the "familiar rule" of liberal treaty construction, *Valentine*, 299 U.S. at 10, 57 S.Ct. at 103. In the absence of any further interpretive guidance, *Blockburger* must be adopted as the operative test for determining the identity of "offenses" under Article 8.

The fact that the *Blockburger* test was not the undisputed law of double jeopardy at the time the Treaty was signed, viz., 1978, is not relevant under the present analysis. The *Blockburger* test is not adopted here because it is the current domestic law of the United States, nor under any claim that it represented the full extent of double jeopardy law at the time the Treaty was signed. Rather, in the absence of any precise objective meaning of *non bis in idem* in international law or any relevant *travaux preparatoires*, *Blockburger* is adopted out of deference to the Executive Branch's interpretation of like provisions in other extradition treaties and its consistency with the principle of liberal construction in favor of extradition. For the same reasons, and not on the basis of its current or past status as the domestic law, Justice Brennan's "same episode or transaction" test is rejected.

Although this court ultimately reaches the same conclusion that the Government urged, albeit on very different grounds, the interpretative exercise herein has not been in vain. In general, the operative terms of an international agreement will not bear the same meaning they do in the context of domestic law, and improper application of the agreement's provisions will inevitably result unless the appropriate rules of construction are scrupulously applied in each case where such issues arise.

### E. Applying the Test

■ Under *Blockburger*, none of the offenses charged in the German arrest warrant are the same "offense" as any of

---

16. The Supreme Court addressed a similar problem in *Charlton v. Kelly*, 229 U.S. 447, 33 S.Ct. 945, 57 L.Ed. 1274 (1913). At issue in *Charlton* was the then-current extradition treaty between the United States and Italy. Article 1 of the treaty provided that the extradition obligation extended to "all persons" taking asylum in the requested state. The United States interpreted "all persons" to include citizens of the requested state, while Italy did not. Faced with this conflict, the Supreme Court held that the treaty was not void, but merely voidable. Under those circumstances, the Court concluded that, unless the Executive Branch were to declare the treaty void, the Judiciary must enforce it as supreme law of the land. *See id.* at 472–76, 33 S.Ct. at 954–55.

those charged in Elcock's federal indictment.[17] The German arrest warrant charges Elcock with violation of two substantive provisions of the German Criminal Code— § 242 ("Theft") and § 243 ("Grand Larceny")—as well as an accomplice liability provision— § 25 ("Preparation of an offense"). Each of the substantive offenses listed in the German arrest warrant requires proof of an additional fact that the offenses in the American indictment did not; thus, each fails the *Blockburger* test for identity of offenses.

In order to prove Elcock guilty of theft under the German statute, the prosecution must establish that Elcock (1) took the personal property (2) of another (3) with the intent of illegally appropriating such property (or that he "jointly committed" this crime with someone else). *See* German Crim.Code §§ 25(2), 242(1).

In contrast, to prove Elcock guilty of international transportation of stolen currency, the United States was required to show that Elcock knowingly and intentionally (1) transported, transmitted, or transferred (2) in foreign commerce (3) money with a value of $5,000 or more, (4) knowing the same to have been stolen. *See* 18 U.S.C. § 2314 (Supp.1999).

To prove Elcock guilty of smuggling, the United States was required to show that Elcock knowingly or fraudulently (1) either imported or brought into the United States, or received after importation, (2) merchandise, (3) contrary to law. *See* 18 U.S.C. § 545 (Supp.1999).

**17.** The Government argues that the comparison of offenses should be limited to Counts One and Three of the American indictment, since there was a hung jury with respect to Count Two (receiving or possessing stolen currency). According to the Government, Count Two is therefore not an offense for which Elcock has been "tried and discharged or punished with final and binding effect" and, hence, cannot supply a basis on which to deny extradition under Article 8.

Elcock, on the other hand, asserts that Count Two was dismissed on the Government's motion after trial. *See Elcock v. United States*, No. 99–CV–1757 (E.D.N.Y. July 21, 1999) (transcript of oral argument at 4–5). Elcock argues that the dismissal should be presumed to be with prejudice and that Count Two was, therefore, "tried and discharged ... with final and binding effect." *See id.*

There are two problems with Elcock's argument. First and foremost, it is not factually accurate. Although the judgment in the criminal case recites that "Count(s) Two is/dismissed by court. Underlying indict. is dismissed by the government," *United States v. Elcock*, No. 97–CR–992 (E.D.N.Y. July 2, 1998) (judgment), and the calendar entry for the final day of trial notes "Ct. 2 is dismissed by court," *id.* (Apr. 3, 1998) (calendar entry), the transcripts of the proceedings on those dates reveal that the Government never made a motion to dismiss Count Two. Rather, after the jury announced that it was unable to reach a verdict as to Count Two, the court stated that it would "dismiss the jury with respect to Count Two." *Id.* (Apr. 3, 1998) (transcript of trial at 331). In subsequent colloquy with the court, the prosecutor stated that he would not seek a retrial with respect to Count Two unless there was a reversal on appeal of the two counts on which there had been a conviction. *See id.* At no point on record did the Government move to dismiss the underlying indictment; nor did the court do so on its own initiative. Further, Count Two was only mentioned at the close of the sentencing hearing at which point the court merely observes that the jury was hung as to Count Two. *See id.* (July 2, 1998) (transcript of sentencing at 13). Thus, the facts on the record in the judgment notwithstanding, Count Two does not appear to have been dismissed, with prejudice or otherwise.

Second, Elcock has cited no authority for the proposition that an order of dismissal that is entered on the Government's motion after a jury has hung is presumed to be with prejudice unless expressly stated otherwise. Indeed, such a presumption would contradict the Supreme Court's instruction that a hung jury is the "prototypical example" of a circumstance in which retrial does not violate double jeopardy. *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982).

At any rate, in light of this court's decision to apply the *Blockburger* test, there is no need to decide the question on this occasion. As discussed below, even if Count Two was "tried and discharged ... with final and binding effect," it is not the same "offense" under *Blockburger* as either of the charges listed in the German arrest warrant and thus does not constitute a bar to Elcock's extradition.

Finally, to prove Elcock guilty of receiving or possessing stolen currency, the United States was required to show that knowingly or intentionally (1) received or possessed (2) money with a value of $5,000 or more (3) which has crossed a State or United States boundary (4) after having been stolen, (5) knowing the same to have been stolen. *See* 18 U.S.C. § 2315 (Supp. 1999).

Clearly, the German theft offense includes elements not included in any of the American offenses. For example, the German theft charge requires proof that Elcock took the personal property of another (or did so jointly), whereas the American international transportation, smuggling, and receipt or possession charges do not. Conversely, the American charges include elements that the German theft charge does not. The German theft charge does require proof that Elcock transported, transmitted, or transferred the stolen property in foreign commerce, or that he imported or brought merchandise into the United States unlawfully, or that the stolen property crossed a United States boundary, as do the American international transportation, smuggling, and receipt or possession charges, respectively. Thus, under *Blockburger* and the Treaty, the German theft charge is a different "offense" than the charges in the American indictment.

The result is same with respect to the second charge of the German arrest warrant. In order to prove Elcock guilty of grand larceny under the German statute, the prosecutor must establish, in addition to the requirements for theft, that the items taken were "protected in a special manner against removal by a locked container or by another protective device." German Crim.Code § 243(1). Again, the German charge is not the same "offense" as any of the American charges under the *Blockburger* test. None of the American charges include any requirement that the stolen money or merchandise had to have been protected by a locked container or any other protective device. Conversely, the German grand larceny charge does not require proof that the item taken was subsequently transported in international commerce or that it crossed United States borders in any way.

Because neither of the charges in the German arrest warrant constitute the same "offense" as any of the charges in the American indictment, Elcock's conviction on Counts One and Three and the dismissal of Count Two of the indictment do not bar Elcock's extradition to Germany under Article 8.[18]

18. Although Justice Brennan's "same episode or transaction" test has been rejected herein as the appropriate standard for identity of "offenses" under the Treaty, even if that test—as elucidated by Judge Friendly in *Sindona*—were applied to these facts, the outcome would be the same. Conceivably, one might argue that the German bank robbery and the currency smuggling constitute different parts of the same transaction because of the fact that there would have been no currency for Elcock to smuggle but for the preceding theft. However, Judge Friendly expressly rejected exactly that understanding of what constitutes a single transaction in *Sindona. See Sindona,* 619 F.2d at 179. While conceding that the "alleged Italian crime may have been the 'but for' cause of the American offenses in providing Sindona with the wherewithal," Judge Friendly found that the Italian and American charges against Sindona did not involve the same acts or transaction where the interests the two prosecutions sought to vindicate, and their factual foci, were different. *Id.* Likewise, while the German bank robbery may have been the "but for" cause of Elcock's smuggling, the American and German prosecutions focus on different facts and seek to protect different interests. The American prosecution centered on the facts of the smuggling and receipt of the currency and sought to protect the integrity of the international mails. The German charges, on the other hand, are concerned primarily with the facts surrounding the bank robbery itself and the harm done thereby to German bank depositors.

### F. The American Case Law Cited by Elcock does not Indicate a Contrary Result.

■ In addition to arguing that *Block-burger* is not the appropriate test for identity of offenses under Article 8, Elcock contends that American courts have consistently held that a defendant cannot be punished separately for theft of property and for receipt of the stolen property. Correctly observing that the double jeopardy protection of Article 8 must be at least as broad as that afforded by the Double Jeopardy Clause, *see Sindona,* 619 F.2d at 178–79, Elcock reasons that he cannot be extradited for theft charges in light of the dismissal of the receipt and possession charge in the American indictment (Count Two).

As previously noted, Elcock's claim that this dismissal was a "discharge[ ] . . . with final and binding effect" is likely incorrect, though the issue is not decided here. *See supra* note 17. However, the fatal flaw in this argument is that neither of the decisions Elcock cites for the proposition that a defendant may not be prosecuted for both theft and receipt of stolen property were decided on a constitutional basis. *See* Pet'r's Mem. at 7–8 (citing *Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961); *United States v. DiGeronimo,* 598 F.2d 746 (2d Cir. 1979)). Rather, each was decided on statutory grounds: The Supreme Court found that Congress intended to punish different wrongdoers through the theft statutes than through the receipt of stolen property statutes. *See DiGeronimo,* 598 F.2d at 749–50 ("*Milanovich* [and other decisions in the same line of Supreme Court cases], were all based on statutory construction, not on constitutional or common law grounds."). Consequently, the cases relied on by Elcock imply nothing about the scope of protection under the Double Jeop-

ardy Clause, and, hence, nothing about the scope of protection under Article 8.

### (2)

### Elcock has not been "Tried and . . . Punished" for the Bank Robbery within the Meaning of Article 8 by Reason of the Sentencing Court's Upward Departure.

■ Elcock also argues that he has been "punished with final and binding effect" for the bank robbery on the grounds that this court considered evidence of the bank robbery as evidence of "relevant conduct" under the Sentencing Guidelines and, based on that evidence, made an upward departure for more than minimal planning. This argument, too, fails.

■ Under domestic law, it is well-settled that an enhancement based on evidence of relevant conduct does not constitute punishment for that conduct for double jeopardy purposes. *See United States v. Watts,* 519 U.S. 148, 154–55, 117 S.Ct. 633, 636–37, 136 L.Ed.2d 554 (1997); *Witte v. United States,* 515 U.S. 389, 403–04, 115 S.Ct. 2199, 2207–08, 132 L.Ed.2d 351 (1995). In the view of American courts, Elcock's sentence was enhanced for more than minimal planning, not for the robbery; the robbery in Germany was considered only as evidence of the planning.

Notwithstanding the domestic understanding of relevant conduct evidence, the question arises whether a sentencing enhancement is "punish[ment]" within the meaning of the Treaty. The Second Circuit decided this question in case involving a nearly identical double jeopardy provision in the United States' extradition treaty with Canada.[19] In *Stowe v. Devoy,* 588 F.2d 336 (2d Cir.1978), the Second Circuit held that the fact that a New York court had considered pending Canadian narcotics charges in sentencing an extraditee for a domestic narcotics offense did not mean that the extraditee had been "punished"

---

19. *See* Treaty on Extradition, Dec. 3, 1971, U.S.-Can., art. 4(1)(i), 27 U.S.T. 983 ("Extradition shall not be granted . . . [w]hen the person whose surrender is sought . . . has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.").

for the Canadian charges within the meaning of the treaty. *See id.* at 340. Like Article 8, the Canadian treaty provision applies only to individuals who have been "tried and discharged or punished." There having been no contention that he had been "tried" by the New York court for the Canadian charges, the extraditee in *Stowe* argued that the provision should be read disjunctively, i.e., as requiring only that an individual have been either "tried and discharged" or "punished." *See id.* Noting that probation reports customarily list all of a defendant's past indiscretions, the Second Circuit rejected this disjunctive reading on the grounds that "does violence not only to [the provision's] language but to the reason and intent of the [t]reaty by giving any court the power to subvert the extradition agreement." *Id.* The Second Circuit therefore held that the language in question requires both that the defendant was "tried" for the offense in question, and that the trial resulted in discharge or punishment. *See id.*

The same argument applies with respect to Article 8. Elcock makes no claim that he was "tried" in America for the bank robbery, nor can he on any plausible reading of the term. Thus, Elcock has not been "tried and ... punished" for the bank robbery as required for Article 8 to apply.

 Moreover, Article 8 qualifies that the "discharge[ ] or punish[ment]" must be "with final and binding effect." The latter term cannot mean final and binding effect in the requesting State according to the laws of the requesting State, because neither American nor German courts recognize a foreign criminal judgment as a basis for dismissing a prosecution on double jeopardy or *non bis in idem* grounds.[20] *See Abbate*, 359 U.S. at 193–195, 79 S.Ct. at 670 (holding that mul-

tiple prosecutions by separate sovereigns do not violate double jeopardy); Peter Wilkitski, *Extradition Law and Practice in the Federal Republic of Germany*, 62 Rev. Int'l de Droit Pénal 281, 282 (1991) ("The law and constant practice of [Germany] have thus far recognized the 'ne bis in idem' principle only in the domestic arena ..., but not in relation to foreign judgments. The mere fact that the alleged offender is the subject of criminal prosecution in a foreign State and has already been convicted or has already served his sentence, is not a fundamental obstacle to conducting the proceedings for the same deed.").[21] On this reading, a foreign judgment would never have "final and binding effect," and the provision would have no effect. Therefore, "final and binding effect" can only mean final and binding effect in the requested State according to the laws of the requested State. Since Elcock's relevant conduct sentencing enhancement does not constitute a punishment with final and binding effect in the United States according to United States law, this court's consideration of the bank robbery evidence at sentencing does not bar Elcock's extradition under Article 8.

### Conclusion

For the reasons stated, Article 8 of the Treaty does not bar Elcock's extradition to Germany to face prosecution for the 1997 bank robbery. Accordingly, Elcock's petition for a writ of habeas corpus preventing his extradition is denied. The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

---

20. On this point, it must be emphasized that the grounds available for seeking dismissal of charges in the courts of a requesting country according to the procedural law of the requesting country and the grounds for refusing extradition from the requested country under the relevant treaty are conceptually distinct matters.

21. However, "[s]hould the outcome [of a subsequent German prosecution] be a new conviction, it creates an obligation to set off the sentence served abroad against the one to be served at home." Wilkitski, *supra*, at 282.