In re: COMMISSIONER'S SUBPOENAS.

United States of America, Appellant.

No. 02–10418.

United States Court of Appeals, Eleventh Circuit.

March 31, 2003.

1288

Joseph A. Capone, Anne R. Schultz, Suzan H. Ponzoli, Miami, FL, Sara Criscitelli, U.S. Dept. of Justice/Office of Intern'l Affairs, Washington, DC, for Appellant.

Benedict P. Kuehne, Sale & Kuehne, P.A., Miami, FL, for Appellee.

Before EDMONDSON, Chief Judge, ANDERSON, Circuit Judge, and POGUE *, Judge.

ANDERSON, Circuit Judge:

This case involves a request made by Canadian law enforcement authorities, pursuant to a mutual legal assistance treaty between Canada and the United States, for the legal assistance of the United States government in subpoenaing seven individuals residing in the Southern District of Florida. The Canadian authorities sought to interview these individuals in connection with an ongoing investigation into possible criminal activities. The subpoenas were initially issued, but upon a motion filed by the subpoenaed witnesses, the district judge quashed the subpoenas. The United States, on behalf of the Canadian authorities, appeals the district court's order quashing the subpoenas.

This case presents an issue of first impression for the federal appellate courts. We must ascertain whether this mutual legal assistance treaty between the two countries obligates the United States, at the request of Canada, to issue subpoenas to compel the testimony of witnesses in a criminal investigation prior to the filing of formal charges. Because we construe this Treaty to obligate both countries to execute requests for the issuance of subpoenas for purposes of compelling testimony in criminal investigations and to arrange

* Honorable Donald C. Pogue, Judge for the United States Court of International Trade, sitting by designation.

for the taking of such testimony even prior to the actual initiation of formal charges, we hold that the Canadian request for assistance should have been granted and the subpoenas should not have been quashed by the district court.

## I. BACKGROUND

### A. *The MLAT Between the United States and Canada*

The Treaty Between the United States and Canada on Mutual Legal Assistance in Criminal Matters, Mar. 18, 1985, U.S.–Can., 24 I.L.M. 1092 ("MLAT" or "Treaty"), was signed at Quebec City, Canada on March 18, 1985, the advice and consent of the United States Senate was received on October 24, 1989, and the Treaty was entered into force on January 24, 1990. The Treaty obligates the two governments to provide "mutual legal assistance in all matters relating to the investigation, prosecution and suppression of offences." MLAT, art. II, ¶ 1. The MLAT with Canada is "one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter more effectively criminal activities." Letter of Transmittal from Ronald Reagan, President of the United States, to the United States Senate, February 22, 1988, S. Exec. Rep. 100–14, 100th Cong., 2d Sess. (July 1985).

Traditionally, evidence sought by a foreign government had to be obtained through a process whereby a written request known as a "letter rogatory" was sent from the court of one country to the court of another asking the receiving court to provide the assistance. A federal statute authorizes federal district courts in this country to entertain such requests and provides that "[t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation." 28 U.S.C. § 1782. Not only can a foreign tribunal bring a request in the form of a "letter rogatory," but section 1782 has been amended to also allow similar requests for assistance to be brought by "interested persons" including foreign governments in foreign investigations or proceedings and private litigants of a foreign proceeding. *See id.* ("The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person."). Requests for assistance initiated directly by an interested person rather than a foreign court are often referred to as "letters of request." Despite the apparent versatility of 28 U.S.C. § 1782, law enforcement authorities found the statute to be an unattractive option in practice because it provided wide discretion in the district court to refuse the request and did not obligate other nations to return the favor that it grants. MLATs, on the other hand, have the desired quality of compulsion as they contractually obligate the two countries to provide to each other evidence and other forms of assistance needed in criminal cases while streamlining and enhancing the effectiveness of the process for obtaining needed evidence. This MLAT between the United States and Canada provides for a broad range of cooperation in criminal matters.[1]

---

1. Mutual assistance available under the Treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in a criminal prosecution. Letter of Transmittal from Pres. Reagan.

Under this Treaty, Canada makes a request for assistance by contacting the United States' "Central Authority" under the Treaty, which is "the Attorney General or officials designated by him." *See* MLAT, art. I (Definitions). If the particular type of assistance requested requires action of a federal district court, the Attorney General and his officials utilize existing statutory authority including 28 U.S.C. § 1782 to bring an action seeking the requested evidence or information. Because the Attorney General simply utilizes the preexisting statutory authority provided under 28 U.S.C. § 1782 when satisfying treaty obligations under the MLAT, the Treaty itself is self-executing obviating the need for implementing legislation. *See* Letter of Transmittal from Pres. Reagan ("The Treaty is self-executing and utilizes existing statutory authority."); Letter of Submittal, Department of State, Feb. 11, 1988, S. Exec. Rep. 100–14, 100th Cong., 2d Sess. (July 1985) ("The Treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly 28 U.S.C. 1782."). Upon its entry into force on January 24, 1990, the MLAT became a law of this land on par with a federal statute.

### B. *Factual Background*

For the past several years, Canadian law enforcement authorities have been investigating an alleged smuggling operation. According to Canadian authorities, goods have been legally exported to the United States and then smuggled back into Canada without payment of the Canadian duty, resulting in a revenue loss for the Canadian government. The smuggling activities allegedly began in 1989. The United States began its own investigation. During the investigations, the two governments shared information and resources. Appellees in this case are seven individuals allegedly involved. After unsuccessfully attempting to conduct voluntary interviews with the seven appellees, the Canadian authorities turned to formal legal process.

### C. *Procedural Background*

In 2000, Canadian authorities asked the United States for assistance. On February 22, 2001, the United States filed a petition in the United States District Court for the Southern District of Florida seeking an order appointing an assistant United ed States attorney as a "commissioner" to assist the Canadian government in obtaining the requested evidence. This request was made pursuant to the MLAT and 28 U.S.C. § 1782. On March 2, 2001, the district court entered an order appointing an assistant United States attorney from the Southern District of Florida, as the "commissioner" and authorizing him to "take such steps as are necessary, including issuance of commissioner's subpoenas to be served on persons within the jurisdiction of this Court, to collect the evidence requested." On April 30, 2001, he issued subpoenas to each of the appellees commanding their appearance at the federal courthouse in Miami on a given date and time, to give testimony to Canadian authorities concerning the Canadian smuggling investigation. Prior to the scheduled testimony, however, the appellees moved in the district court to quash the subpoenas and for a protective order.

On August 23, 2001, a magistrate judge ordered that the subpoenas be quashed. First, the magistrate judge held that by its own terms, the MLAT fully incorporates the existing substantive law of the United States as the "Requested State," including 28 U.S.C. § 1782. According to this Circuit, section 1782 contains an implicit foreign discoverability requirement. This rule requires that the information sought in the United States be discoverable under the laws of the foreign jurisdiction. The magistrate judge reasoned that since Canadian authorities are not allowed to compel witness testimony in domestic criminal

investigations at the pre-charge stage, such testimony cannot be compelled in this case by virtue of this Circuit's construction of 28 U.S.C. § 1782. Second, the magistrate judge focused on the second paragraph of section 1782(a) which explicitly states that "a person may not be compelled to give his testimony ... in violation of any legally applicable privilege." The magistrate judge held that the inability under Canadian law to compel witness testimony in a criminal investigation prior to the filing of formal charges amounted to a "legally applicable privilege" and therefore, for this additional reason, the appellees could not be compelled to provide the testimony. On behalf of the Canadian authorities, the appointed commissioner and the United States sought reconsideration of the magistrate judge's ruling in the district court. After further briefing by the parties, the district court affirmed the magistrate judge's order quashing the subpoenas, finding the magistrate judge's order not "clearly erroneous or contrary to law."[2] The district court entered a final order quashing the subpoenas.

### D. *Appellate Jurisdiction and Standard of Review*

This Court's appellate jurisdiction arises from 28 U.S.C. § 1291. This Court reviews *de novo* the district court's interpretation of a treaty or federal statute. *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir.1994). The district court's discretionary authority pursuant to 28 U.S.C.

§ 1782 is reviewed for abuse of discretion. *United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir.2001). The recognition or application of a privilege presents a legal question subject to *de novo* review. *United States v. Hernandez*, 141 F.3d 1042, 1049 (11th Cir.1998).

### II. DISCUSSION

In accordance with the terms of the Treaty, officials from the Department of Justice utilized 28 U.S.C. § 1782 to execute Canada's request for assistance under the Treaty. The officials brought a petition in federal court seeking the appointment of a commissioner to issue seven witness subpoenas. Article II, ¶ 2(e) of the MLAT states that "[a]ssistance [under the Treaty] *shall include ... taking of evidence of persons* " and Article VII, ¶ 1 states, in part, that "[t]he Courts of the Requested State *shall have jurisdiction to issue subpoenas,* search warrants or other orders necessary to execute the request." (emphasis added). Stated even more directly, Article XII, ¶ 1 provides that "[a] person requested to testify and produce documents, records or other articles in the Requested State *may be compelled by subpoena or order to appear and testify* and produce such documents, records and other articles, in accordance with the requirements of the law of the Requested State." (emphasis added). Without question, this general type of assistance, the compelled testimony of witnesses, is expressly within the scope of the Treaty.[3]

---

**2.** The district court correctly observed that the standard of review by which it reconsidered the magistrate judge's determination of the instant pretrial matter is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).

**3.** *See also* Letter of Transmittal from Pres. Reagan, *supra* note 1 ("Mutual assistance available under the treaty includes ... the taking of testimony or statements of witnesses."); Letter of Submittal, Department of

State ("The Treaty thereby provides for assistance at the investigative stage" which includes "taking testimony or statements of persons"). *See generally* Technical Analysis of the Treaty between the United States and Canada on Mutual Legal Assistance in Criminal Matters ("Technical Analysis") (*reprinted in* S. Treaty Doc. 100–14, 100th Cong., 2d Sess. at 10 & 13–14 (1988)) (discussing use of Treaty to issue subpoenas to compel testimony in criminal investigations).

In granting the motion to quash, however, the magistrate judge determined that, according to the Treaty itself, all Canadian requests under the MLAT were subject to the entire substantive law of the United States, including 28 U.S.C. § 1782. The magistrate judge reasoned that "[u]nder the MLAT, Canada's request is to be evaluated under U.S. law." This conclusion was based upon the magistrate judge's interpretation of Article VII, ¶ 2 of the Treaty, which states that "[a] request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State, in accordance with the directions stated in the request."[4] The magistrate judge concluded that "[b]y its own terms therefore, the MLAT mandates that this Court apply 28 U.S.C. § 1782 as the statutory authority or law of the Requested State."

As a law of the Requested State, the magistrate judge then considered cases from this Circuit construing 28 U.S.C. § 1782. The magistrate judge recognized that the law of this Circuit requires a foreign government conducting a criminal investigation prior to filing formal charges and seeking assistance under 28 U.S.C. § 1782 by way of a letter of request to first establish that the information sought in this country would be discoverable under the domestic laws of the foreign country (the requesting state). In the case of *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago*, 848 F.2d 1151, 1156 (11th Cir.1988) ("*Trinidad and Tobago* "), government authorities from Trinidad and Tobago sought assistance with an ongoing criminal investigation. This Circuit held that, in order for a district court to grant assistance, the information sought must be discoverable in the foreign country. *Id.* at 1156. According to *Trinidad and Tobago*, 28 U.S.C. § 1782 implicitly requires foreign discoverability as a prerequisite to the grant of assistance to foreign authorities. *Id.* Other cases from this Circuit further establish the foreign discoverability requirement as an implicit and mandatory limitation of the discretion of a district court to grant requests made under 28 U.S.C. § 1782. *See Lo Ka Chun v. Lo To*, 858 F.2d 1564, 1566 (11th Cir.1988) (relying on *Trinidad and Tobago* in a case involving a letter of request of a private litigant and holding that the district court must decide whether the evidence would be discoverable in a foreign country before granting assistance). *See also United Kingdom v. United States*, 238 F.3d 1312, 1319 (11th Cir.2001) (noting the foreign discoverability requirement established in *Trinidad and Tobago* in considering a letter rogatory from an English court). *See also Application of Asta Medica, S.A.*, 981 F.2d 1, 5–7 (1st Cir.1992) (providing a thorough explanation of the foreign discoverability requirement).

Reading Article VII, ¶ 2 of the MLAT to incorporate by reference the entire substantive law of the Requested State, the magistrate judge concluded that the treaty request was subject to this Circuit's interpretation of 28 U.S.C. § 1782 requiring foreign discoverability as a condition precedent to granting requests made by foreign governments through letters of request and letters rogatory. Since the parties agreed that there was no authority under Canadian law to compel this type of testimony from witnesses

---

4. *See also* Article XII, ¶ 1 providing that evidence shall be taken in the requested state "in accordance with the requirements of the law of the Requested State." Article VII, ¶ 2 and Article XII, ¶ 1 are the two provisions in the MLAT that contain "law of the Requested State" language. In this case, the appellees have focused their arguments entirely upon Article VII, ¶ 2.

**1294**

in a domestic criminal investigation where no charges had yet been filed, the magistrate judge held that 28 U.S.C. § 1782 and its foreign discoverability requirement precluded the assistance in this case.

We must decide whether the magistrate judge correctly interpreted the MLAT between the United States and Canada. That question turns on the intended role of 28 U.S.C. § 1782 in requests for assistance under the MLAT. The precise issue facing this court is whether the MLAT permits, at the request of Canada, the issuance of subpoenas and the taking of compelled testimony in a pre-charge Canadian criminal investigation of seven witnesses who reside in the Southern District of Florida.

A. *Principles of Treaty Interpretation*

To decide the question presented, we turn to fundamental principles of treaty construction and interpretation. The goal of treaty interpretation is to determine the actual intention of the parties "because it is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *Air France v. Saks*, 470 U.S. 392, 399, 105 S.Ct. 1338, 1342, 84 L.Ed.2d 289 (1985). The analysis of the parties' intentions "begin[s] with the text of the treaty and the context in which the written words are used." *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534, 111 S.Ct. 1489, 1493, 113 L.Ed.2d 569 (1991); *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988). *See also United States v. Duarte–Acero*, 208 F.3d 1282, 1285 (11th Cir.2000). The clear import of treaty language controls unless application of the words of the treaty according to their obvious "meaning effects a result inconsistent with the intent or expectations of its signatories." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 180, 102 S.Ct. 2374, 2377, 72 L.Ed.2d 765 (1982).

"If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, our analysis ends there and we apply the words of the treaty as written." *Duarte–Acero*, 208 F.3d at 1285. *See also Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134, 109 S.Ct. 1676, 1684, 104 L.Ed.2d 113 (1989) ("[W]here the text is clear ... we have no power to insert an amendment."). As Justice Story wrote long ago, "to alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty." *The Amiable Isabella*, 6 Wheat. 1, 71, 5 L.Ed. 191 (1821). But, if the treaty text is ambiguous when read in context in light of its object and purpose, then extraneous sources may be consulted to elucidate the parties' intent from the ambiguous text. *See Chan*, 490 U.S. at 134, 109 S.Ct. at 1684.

B. *Ambiguity in the Text of the Treaty*

Upon our reading of the text of this Treaty, we conclude that the magistrate judge erred in construing the MLAT to express a clear and unambiguous intent to make requests under the Treaty subject to the limitations of all other substantive law of the United States including 28 U.S.C. § 1782. Undeniably, the magistrate judge's interpretation finds some support in the treaty text. As the magistrate judge points out, Article VII, ¶2 states that "[a] request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State." While not mentioned by the magistrate judge, Article XII, ¶1 also contains a similar

reference to the "law of the Requested State." Those two sentences, if read in isolation, arguably incorporate the substantive limitations of 28 U.S.C. § 1782 as a law of the United States. And as discussed above, that statute has been held to implicitly require a showing of foreign discoverability, at least in the traditional case involving a letter rogatory or letter of request. Given the fact acknowledged by all parties that Canada lacks the power to compel the taking of testimony in a pre-charge setting, the application of a foreign discoverability requirement to MLAT requests by Canada would deny the court the power to grant Canada the type of assistance sought in this case. But when the entire Treaty is read in context, we conclude that other language in its text, apparently overlooked in the lower court, suggests an alternate, reasonable, construction of the "law of the Requested State" phrases contained in Articles VII and XII of the MLAT.

Starting with the Preamble, the MLAT expresses an intent to obligate both countries to provide assistance to each other in criminal matters during both the pre-charge "investigation" and post-charge "prosecution" stages. The Preamble states that the United States and Canada desire "to improve the effectiveness of both countries in the *investigation, prosecution* and suppression of crime through cooperation and mutual assistance in law enforcement matters." MLAT Preamble (emphasis added). Then, Article II, ¶ 1 states that "[t]he Parties shall provide" such assistance, using language that illustrates the obligatory nature of the assistance even at the investigative stage. Article II, ¶ 2 specifically includes the "taking the evidence of persons" in a list of types of assistance the parties *shall* provide under the Treaty. Certainly, this language indicates that Canada expects to be able to obtain witness subpoenas and compel the testimony of witnesses during an ongoing criminal investigation. Nothing in Article II limits this exercise or expresses a contrary intent with respect to Canadian as opposed to American requests of this type.

Article V of the MLAT is entitled "Limitations on Compliance" and explicitly limits the situations where the Requested State may deny the other party's request for assistance. Article V limits these situations to those involving requests not in conformity with the provisions of the Treaty and requests that are "contrary to [the Requested State's] public interest." "Public Interest" is defined in Article I as "any substantial interest related to national security or other essential public policy." If Article VII, ¶ 2 is to be construed as placing a much more restrictive limitation by allowing a request only if consistent with the entire substantive law of the Requested State, then the narrow limitations on providing assistance laid out in Article V would be rendered meaningless. We, however, presume that no language contained in a treaty is mere surplusage and we will construe a treaty in a way that gives purpose and effect to *all* of its language.

 The phrase in Article VII, ¶ 2 that guided the magistrate judge's interpretation can be reasonably interpreted to address the procedures and methods employed in executing treaty requests and not the substantive law influencing the decision to grant or deny a request. Article VII, entitled "Execution of Requests," states:

> 1. The Central Authority of the Requested State shall promptly execute the request, or when appropriate, transmit it to the competent authorities, who shall make best efforts to execute the request. The Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to execute the request.

2. A request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State, in accordance with the directions stated in the request.

MLAT, Art. VII. While the magistrate judge interpreted ¶ 2 of this article to require a district court to ensure that a MLAT request that is otherwise permitted by the Treaty to also be consistent with all other existing United States substantive law, an alternative construction can be reasonably discerned from a reading of Article VII in its entirety. The article addresses the "Execution of Requests." Paragraph 1 contains two sentences. The first sentence directs the "Central Authority of the Requested State," to make best efforts to promptly "execute" the request. The second sentence of ¶ 1 grants the "Courts of the Requested State" jurisdiction to issue *subpoenas* and other forms of assistance necessary for the execution of the request.[5] The appellees focus solely on ¶ 2 read in isolation. But, in treaty interpretation as in statutory interpretation, particular provisions may not be divorced from the document as a whole and read in insolation. *Sea Hunt v. Unidentified Shipwrecked Vessel,* 221 F.3d 634, 646 (4th Cir.2000). In carefully reading all of Article VII, paragraph 2 can reasonably be construed as requiring the Attorney General's office to follow existing *procedures* of United States law in seeking the requested assistance on behalf of Canada notwithstanding any contrary directions stated by Canada in the request that are prohibited by United States law.

The text of Article XII adds to the ambiguity of the Treaty with respect to the issue before this court. In addressing the "Taking of Evidence in the Requested State," Article XII, ¶ 1 states that "[a] person requested to testify and produce documents, records or other articles in the Requested State may be compelled by subpoena or order to appear and testify and produce such documents, records and other articles, in accordance with the requirements of the law of the Requested State." This article explicitly embraces the very assistance sought by Canada in this case— subpoenas to compel witness testimony. But at the same time, it uses "in accordance with ... the law of the Requested State" language that is similar to that found in Article VII. Again, because subpoenas are expressly embraced, the limiting phrase can reasonably be read to require the taking of the evidence in the Requested State to follow the existing *procedures* used in the Requested State, i.e., the law of the Requested State with respect to the issuance of subpoenas, the taking of testimony, etc.

■■■ In light of our careful examination of the Treaty as a whole read in context and the lack of clarity provided in its language as to the meaning and purpose of the "law of the Requested State" in Articles VII and XII, we conclude that the treaty text is ambiguous with respect to the propriety of Canadian requests under the Treaty for assistance regarding pre-charge compelled testimony in a criminal investigation. We are presented with two reasonable alternative interpretations: on the one hand, the "law of the Requested State" might incorporate all the laws of the Requested State, including laws that provide standards for granting or denying requests made by way of a letter rogatory or letter of request; on the other hand, the

---

**5.** It is also noteworthy that this sentence expressly recognizes and embraces the courts' authority to issue subpoenas in an MLAT request for assistance without stating any limitations with respect to Canada or criminal investigations occurring prior to the filing of formal charges.

"law of the Requested State" might only refer to the laws providing the ways and means for executing valid MLAT requests for assistance. "Where the text—read in the context of its structure and purpose—is ambiguous, we may resort to extraneous tools of interpretation." *Croll v. Croll,* 229 F.3d 133, 136 (2d Cir.2000). "Treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Schlunk,* 486 U.S. at 700, 108 S.Ct. at 2108 (*quoting Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943)).

 C. *Resolving the Ambiguity: "Law of the Requested State" Addresses Procedural Methods not Substantive Laws*

▮▮▮▮▮ While the foregoing reasoning has led us to conclude that the text of the Treaty is ambiguous with respect to the instant issue, affording two reasonable interpretations, we conclude that our ultimate construction is decidedly the more plausible of the two. We conclude that the most logical construction of the phrase "law of the Requested State" in the MLAT is that the Treaty partners intended to utilize the established procedures set forth in the existing laws of the Requested State to execute the treaty requests, rather than to subject each and every treaty request to any and all limitations of existing law of the Requested State. That is, the Treaty utilizes § 1782 as a procedure for executing requests, but not as a means for deciding whether or not to grant or deny a request so made. This construction is more plausible primarily because of Article V, which delineates only narrowly confined circumstances in which the Requested State "may deny assistance." Article V is

entitled "Limitations on Compliance" and provides, in relevant part:

 1. The Requested State may deny assistance to the extent that

 a) the request is not made in conformity with the provisions of this Treaty; or

 b) execution of the request is contrary to its public interest, as determined by its Central Authority.

Moreover, "public interest" is itself narrowly defined in Article I of the Treaty to mean "any substantial interest related to national security or other essential public policy." If a request could be denied based on any limitation provided by the substantive law of the Requested State, as appellees urge, Article V's specific limitation where the request would be contrary to the public interest of the Requested State would be rendered superfluous.

The treaty negotiations and ratification history, fundamental canons of treaty construction, and analogous cases construing similar language in the text of other treaties also point strongly to our ultimate construction. We now turn to these other considerations.

 1. Treaty Negotiation and Ratification History

 (a) Executive Branch's Official Explanation of Article VII, ¶ 2

The negotiators' explanation of ¶ 2 of Article VII, provided in the Technical Analysis, does not support the appellees' reading. The Technical Analysis, included in the ratification history at S. Treaty Doc. 100–14, 100th Cong., 2d Sess. (1988), "was prepared by the United States negotiating team, [and] constitutes the formal executive branch representation as to the meaning of this treaty and the obligations to be assumed by the United States under it."

*See* Technical Analysis at 5. The Analysis states that "Article VII(2) provides that the Requested State is to execute the request pursuant to its own laws, practices, and procedures, except that 'directions stated in the request' will be honored unless prohibited by domestic law." Technical Analysis at 10. Despite appellees' assertion that "law of the Requested State" plainly incorporates the substantive law, nowhere in the treaty negotiators' explanation of ¶ 2 of Article VII do the negotiators make any statements that are consistent with or offer any support for the appellees' reading. Rather, the entire paragraph explaining ¶ 2 addresses the methods and procedures by which treaty requests should be executed. The negotiators construe ¶ 2 to address how the Requested State shall handle "directions stated [by the Requesting State] in the request" concerning the way in which the particular information is to be sought. Unless the Requested State prohibits conformance with the particular "directions stated in the request," then the Requested State should execute the request consistent with those directions. *Id.* The negotiators then give examples of videotaping, notice to persons, and presence of certain persons when evidence is taken, all of which deal with the procedural methods for executing requests. *Id.* After carefully reading the entire explanation of Article VII, it is clear that the negotiators did not intend ¶ 2 to incorporate and subject all treaty requests to the entire substantive law of the Requested State, but rather they intended Article VII, ¶ 2 to address the procedures and methods to be used by the

Requested State in executing the treaty requests. This official interpretation by the executive branch is entitled to great deference by this Court. *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 168, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999).

(b) Article VII is Intended to Provide "Slightly Broader Authority" than 28 U.S.C. § 1782

In its Technical Analysis, the executive branch states that one purpose of ¶ 1 of Article VII of the MLAT,[6] is to "provide[ ] slightly broader authority than 28 U.S.C. § 1782 for U.S. federal courts to use their power to issue subpoenas and other process when Canada needs evidence for use before an administrative agency...." Technical Analysis at 10. In this statement, the negotiators were apparently concerned with several circuits' restrictive interpretation of 28 U.S.C. § 1782 as it then existed. These courts read the statute in a way that limited its scope to *pending* proceedings in *judicial* tribunals. The real significance of this executive branch statement in this case is the fact that the negotiators were making clear that ¶ 1 of Article VII allowed assistance that would not otherwise be permitted under section 1782 as it was being construed at that time. According to the actual words used by the negotiators, Article VII of the Treaty "provides slightly broader authority than 28 U.S.C. 1782 for U.S. federal courts to use their power to issue subpoenas and other process when Canada needs evidence." This makes clear that

---

6. Notably, this is the lead paragraph of the very same article upon which the appellees here place almost exclusive reliance. This first paragraph provides that:

The Central Authority of the Requested State shall promptly execute the request, or, when appropriate, transmit it to the competent authorities, who shall make best efforts

to execute the request. The Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to execute the request.

MLAT, art. VII, ¶ 1. Of course, appellees focus only on the second paragraph of this article.

the negotiators read the MLAT as not being simply subject to the limits of 28 U.S.C. § 1782. If all MLAT requests were subject to the limits of section 1782, then the MLAT necessarily could not "provide slightly broader authority than 28 U.S.C. 1782 for U.S. federal courts to use their power to issue subpoenas ... when Canada needs assistance." This interpretation of ¶ 1 of Article VII cannot be reconciled with a reading of ¶ 2 of that same article to fully incorporate 28 U.S.C. § 1782 as a substantive limitation of Canadian MLAT requests. The Technical Analysis, constituting the executive branch's official interpretation of the Treaty, is entitled to much deference by this Court. *See El Al Israel Airlines, Ltd.,* 525 U.S. at 168, 119 S.Ct. at 671. Moreover, we find this interpretation to be entirely reasonable in light of all the facts and circumstances.

### (c) Rejection of "Dual Criminality"

Another provision of the Treaty lends additional support to this interpretation. Article II of the MLAT, entitled "Scope of Application," contains a provision rejecting the rule of "dual criminality." "Dual criminality" is the rule that the offense for which the foreign state seeks assistance must also constitute a crime in the requested state. Article II, ¶ 3 explicitly provides that "[a]ssistance shall be provided without regard to whether the conduct under investigation or prosecution in the Requesting State constitutes an offence or may be prosecuted by the Requested State." The negotiators state in the Technical Analysis that "[b]y avoiding a dual criminality provision in this Treaty, the United States expects to receive assistance for such important crimes as, for instance, money laundering, even though Canada has yet to enact similar legislation." Technical Analysis at 5. This provision makes clear an intent that requests for assistance not be routinely impeded or denied by

virtue of the Requested State's own laws. If Article VII, as appellees contend, subjects all requests to the limitations of existing Requested State substantive law, then many requests would be impeded by the operation of an indirect dual criminality provision that is explicitly rejected in Article II. Therefore, if Article VII, ¶ 2 is read as the appellees contend, a dual criminality provision will be brought into the Treaty through the back door. On the other hand, construing Article VII, ¶ 2 as we do to refer only to the procedures and methods of executing a request and taking evidence pursuant to such a request is completely consistent with and in no way undermines Article II's rejection of the dual criminality rule.

### 2. Canons of Treaty Construction

### (a) Uniformity and Reciprocity Among Treaty Partners

Interpreting the MLAT to subject each and every request to the existing substantive law of the requested state runs contrary to another fundamental principle of treaty interpretation. "Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between national legal systems." Restatement (Third) of Foreign Relations § 325 cmt. d; *United States v. Lombera–Camorlinga,* 206 F.3d 882, 888 (9th Cir. 2000). Obviously, the United States and Canada have their own domestic substantive law. Consequently, under the appellees' construction of the MLAT, the viability of requests under the Treaty would often turn on which country is entertaining the request, even if the information requested is identical.

We find no statements anywhere in the text of the Treaty or its negotiation and ratification history to suggest that the par-

ties did not intend the obligations to be reciprocal and uniform. In fact, a desire for uniform treatment of similar requests made by the two countries underlies the decision to enter into the MLAT in the first place. The Treaty's ratification history reveals that in conjunction with signing the Treaty, Canada enacted implementing legislation to give its courts the authority to execute requests from the United States for assistance in criminal investigations prior to the filing of formal charges. *See* Report from the Committee on Foreign Relations, S. Treaty Doc. 100–14, 100th Cong., 2d Sess. (1988) at 2–3. *See also* Technical Analysis at 1–2. That implementing legislation is known as the Mutual Legal Assistance in Criminal Matters Act (MLACMA), R.S.C.1985, c. 30 (4th Supp.), s. 18.

Prior to the MLAT, because Canada's domestic law prohibited compelled testimony from witnesses prior to charges being filed, assistance was denied to authorities from the United States. The MLACMA was enacted along with the MLAT "to remove the legal barrier and permit (indeed, obligate) Canada to provide assistance prior to indictment ... [and make] assistance available at the investigative stage." Technical Analysis at 2. That legislation was intended to make sure that there would be no remaining legal impediments to MLAT requests made back-and-forth between the two countries.

If the circumstances were reversed in this case and the United States sought this type of assistance from the Canadian courts, such assistance would seemingly be available under the MLAT by virtue of the Canadian implementing legislation. This treaty negotiation and ratification history makes clear that uniformity and reciprocity regarding requests for assistance in criminal matters were a vital concern of the two countries in entering into the MLAT. That is precisely what the

United States was seeking to accomplish in requiring Canada to enact the implementing legislation along with the MLAT. *See* Report from the Committee on Foreign Relations, S. Treaty Doc. 100–14 at 2–3 (explaining that the MLAT along with Canada's implementing legislation "will remove the legal barrier and obligate Canada to provide assistance at the investigative stage" and the MLAT will "add an element of standardization and uniformity to criminal procedures"); Technical Analysis at 1–2. Nevertheless, the appellees urge us to construe this Treaty in a way that destroys the uniformity and reciprocity that the treaty drafters intended to create by requiring Canada to adopt this implementing legislation concurrent with the Treaty. We cannot faithfully construe the Treaty in such a manner.

(b) Liberal Construction to Effectuate Stated Purpose of the Treaty

The purposes and objectives stated in the Treaty's preamble supports an interpretation of the MLAT that allows the issuance of subpoenas at the request of Canada to compel testimony of witnesses pursuant to a criminal investigation occurring prior to the filing of formal charges. The Preamble of the MLAT states that it was created out of a desire "to improve the effectiveness of both countries in the investigation, prosecution and suppression of crime through cooperation and mutual assistance in law enforcement matters." MLAT, Preamble. We agree with the appellant that if the MLAT is read to only allow assistance that is already obtainable through the letter rogatory process, it would have accomplished very little. While such a reading would at least allow the Treaty to serve to make assistance between the two countries part of a binding agreement, the scope of assistance would be unchanged, rendering the Treaty of little practical significance and no great

improvement would have been achieved in the area of international criminal investigation and prosecution. Such a narrow reading is contrary to the fundamental principle of treaty interpretation that a treaty "should be construed liberally to give effect to the purpose which animates it and that even where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred." *United States v. Stuart*, 489 U.S. 353, 368, 109 S.Ct. 1183, 1192, 103 L.Ed.2d 388 (1989). *See also St. Paul Ins. Co. v. Venezuelan Int'l Airways*, 807 F.2d 1543, 1546 (11th Cir.1987). We reject the appellees' interpretation of treaty language that would make the Treaty nearly superfluous in light of existing law. By reading Article VII, ¶ 2 to refer to procedures and methods rather than to incorporate a serious and debilitating limitation on the permissible scope of assistance under the Treaty, we faithfully interpret the MLAT in the context of its stated purposes and objectives. This construction will fully effectuate the MLAT's intended goal of improving the effectiveness of both countries' ability to investigate, prosecute and suppress crime.

3. Additional Weaknesses in Appellees' Construction

(a) The Treaty Partners Did Not Contemplate a Foreign Discoverability Requirement

 First, in light of the history of the Treaty and the overall context in which it was created, we conclude that the Treaty's reference to the "law of the Requested State" does not in fact indicate that the parties expected to incorporate the doctrine of foreign discoverability. Treaties, "like other contracts, are to be read in the light of the conditions and circumstances existing at the time they were entered into, with a view to effecting the objects and purposes of the States thereby contracting." *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 262, 104 S.Ct. 1776, 1788, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting) (internal quotation omitted). Words in a treaty are to be taken in their ordinary meaning as understood by the contracting parties and should not be construed in an artificial or special sense impressed upon them by local law unless such a restricted sense is clearly intended. *Id.* at 263, 104 S.Ct. at 1788. The MLAT was signed in Quebec in March of 1985. At that time, the notion of foreign discoverability as an implicit requirement under 28 U.S.C. § 1782 had received very little attention in the lower federal courts. While at least one district court had adopted such a rule in the context of a private litigant seeking assistance by way of a letter of request under section 1782, *see In re the Court of the Commissioner of Patents for the Republic of South Africa*, 88 F.R.D. 75 (E.D.Pa.1980), no circuit court had yet fully embraced the concept.

There was little development in the law after the negotiations and signing of the Treaty in Quebec. Between the Treaty's signing in 1985 and its entry into force in January 1990, only this Circuit read a foreign discoverability requirement into section 1782. *See Trinidad and Tobago*, 848 F.2d 1151, 1156 (11th Cir.1988) and *Lo Ka Chun v. Lo To*, 858 F.2d 1564, 1566 (11th Cir.1988). While these Eleventh Circuit decisions clearly set forth this Circuit's law with respect to letter requests and letters rogatory under 28 U.S.C. § 1782, the almost complete absence in the entire federal courts of any indication of a foreign discoverability requirement as an implicit part of 28 U.S.C. § 1782 makes it a very dubious proposition to suggest that the governments of the United States and

Canada intended to subject all *Treaty requests* to such a limitation.[7]

 If there were any doubt about our conclusion that the parties did not intend to subject Canadian treaty requests to a foreign discoverability requirement, the Technical Analysis provides significant clarity. And, as the executive branch's official construction of the Treaty, this analysis is entitled to significant deference by this Court. "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982). The "Introduction" section of the Technical Analysis discusses the reasons for the creation of the Treaty and notes the fact that, in the past, the Canadian courts would refuse many requests for assistance by law enforcement officials from the United States because the information sought was for investigative purposes prior to the initiation of formal criminal charges. In so noting, the negotiators recognized that this created "unequal treatment since the United States provided assistance [to Canada] without regard to whether the case was pre– or postindictment." Technical Analysis at 1. In an endnote, the negotiators elaborated that "[a]ssistance is available for a foreign country under 28 U.S.C. 1782 without regard to whether the action has already been filed." *Id.* at 26 n. 2. Here, the negotiating team specifically discussed requests by Canada under section 1782 and understood section 1782 to allow for assistance without regard to lack of discoverability in Canada of compelled testimony prior to the actual filing of criminal charges. These statements in the Technical Analysis, constituting formal executive branch interpretations, all but foreclose any argument that the parties intended to subject the Attorney General's petitions, made honoring a Treaty request, to a foreign discoverability requirement for letters rogatory and letters of request.

**(b) Prior Cases Construing Similar Language in Other Treaties**

Prior cases involving similar language in other treaties further illustrate that vague and general references to the "law of the Requested State" in treaties must be carefully construed in the context of all the language of the Treaty and cannot simply be read in mechanical fashion as the appellees contend. This Circuit in *Martin v. Warden, Atlanta Pen,* 993 F.2d 824, 829 (11th Cir.1993), dealt with similar language in an extradition treaty between the United States and Canada. In *Martin,* Canada failed to seek Martin's extradition for over

---

**7.** For this same reason, appellees' argument regarding President Reagan's statement in his February 22, 1988 Letter of Transmittal to the Senate that "[t]he Treaty is self-executing and utilizes existing statutory authority" and the statement contained in the February 11, 1988 Letter of Submittal that "[t]he treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly 28 U.S.C. § 1782" is unpersuasive. There is no indication anywhere in the record that President Reagan was even aware of the single district court decision issued in 1980, much less that he was actually contemplating its application to Canadian requests under the MLAT. Additionally, the *Trinidad and Tobago* (issued July 7, 1988) and *Lo Ka Chun* (Nov. 8, 1988) decisions by this Circuit were issued months after the President's transmittal letter.

Moreover, the President's use of the word "utilize" in his statement in the letter suggests that he was referring to the mere procedural use of section 1782 to execute treaty requests rather than the substantive incorporation of section 1782 into the MLAT. If the President's words were indeed intended to drastically curtail the scope of MLAT assistance by incorporating a foreign discoverability rule as a limitation of all requests, we believe that he would have stated that position in a more explicit and direct way.

seventeen years. Recognizing that there is no direct constitutional right to a speedy extradition, Martin argued that language in the treaty incorporated United States law, including the Sixth Amendment right to a speedy trial, by providing that "the person whose extradition is sought shall have the right to use all remedies and recourses provided by the law of the Requested State." *Id.* The court rejected Martin's attempt to read the language to incorporate either the Fifth or Sixth Amendment, i.e., the substantive law of the Requested State. *Id. Accord Murphy v. United States,* 199 F.3d 599, 603 (2d Cir. 1999) (construing same language not to entitle a fugitive to the constitutional protections that underlie a United States statute of limitations). The Ninth Circuit has reached similar conclusions in two separate cases. That court rejected the argument that the treaty provision entitles the fugitive to invoke the protections that the requested state's laws afford defendants in domestic prosecutions. *Matter of Extradition of Kraiselburd,* 786 F.2d 1395, 1398 (9th Cir.1986) (Kennedy, J.); *Kamrin v. United States,* 725 F.2d 1225, 1227 (9th Cir.1984).

A district court opinion from 2000 explains the reasoning behind interpreting this type of treaty language as failing to incorporate wholesale the substantive law of the requested state. In *Elcock v. United States,* 80 F.Supp.2d 70, 77 & n. 10 (E.D.N.Y.2000), the extradition treaty provided that "[e]xcept where this Treaty provides, the law of the Requested State shall be applicable with respect to provisional arrest, extradition, and transit." The court acknowledged that this "reference to the 'law of the Requested State' in connec-

tion with 'extradition' might be read to suggest that the Treaty incorporates the substantive domestic law of the Requested State into the extradition provision of the Treaty." *Id.* at 77 n. 10. But, looking to ratification history, the court concluded that the treaty provision referred to the Requested State's procedures rather than its substantive law. *Id.* The court also noted that "United States courts have consistently ruled that similar provisions in other treaties do not import substantive constitutional or statutory protections into the extradition context," citing *Murphy, Martin, Kraiselburd,* and *Kamrin.* The court concluded that:

> Had the parties intended that each would apply its own [substantive] law in determining whether the requested extradition would violate double jeopardy principles, they could have clearly stated as much.... In the absence of such a provision, a court may not simply rely on the meanings the terms of the treaty have in the context of domestic law.

*Id.* at 77.

We recognize that all of these extradition cases involve factual scenarios and treaties that are quite distinguishable from the case we decide today. But, given that the seven appellees in this case are relying upon similar language to make the same type of argument that has been consistently rejected, we find these cases instructive. These cases make clear that vague and general treaty language referring to "the law of the Requested State" should not be read in a mechanical fashion and automatically interpreted as incorporating the substantive law of the Requested State, but should rather be read in full context of the purposes and objectives of the Treaty as a whole.[8]

---

**8.** We note that appellees place significant reliance on the Second Circuit case of *In re Erato,* 2 F.3d 11 (2d Cir.1993). There, the court was addressing the interplay between 28 U.S.C. § 1782 and an MLAT between the United States and the Netherlands. *Id.* at 12.

In its opinion, the *Erato* court did suggest that a different phrase in that treaty—"according to the domestic law and procedures of the Requested State"—might incorporate United States law including 28 U.S.C. § 1782. *See*

4. Conclusion: Any Ambiguity in the "Law of the Requested State" Resolved

"It is the intention of the parties that must control any attempt to interpret a treaty." *United States v. Duarte–Acero,* 208 F.3d 1282, 1285–86 (11th Cir.2000) (*quoting Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979)). "It is *our* responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 167, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999). Considering both textual and nontextual sources, we conclude that the MLAT allows for the issuance of subpoenas in this case pursuant to the Canadian request for assistance.

Granting some ambiguity in the text, we nevertheless conclude that when the "Requested State" language is read in context with the entirety of the Treaty's text, the most plausible interpretation is the one we reach. Our interpretation finds strong, indeed overwhelming, support in the construction given the Treaty by the executive branch. As explained above, it is clear that the executive branch interpreted the Treaty to provide for discovery requests by either the United States or Canada with respect to pre-charge criminal investigations. Our interpretation is consistent with that of the executive branch; appellees' is not. "Respect is ordinarily due the

reasonable views of the Executive Branch concerning the meaning of an international treaty." *Id.* at 168, 119 S.Ct. at 671. *See also Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 926, 6 L.Ed.2d 218 (1961) ("[T]he meaning given [treaties] by the departments of government particularly charged with their negotiation and enforcement is given great weight."). Similarly, "[t]he practice of treaty signatories counts as evidence of the treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed." *United States v. Stuart,* 489 U.S. 353, 369, 109 S.Ct. 1183, 1192–93, 103 L.Ed.2d 388 (1989). Based on its actions in this particular case, the government of Canada understands the Treaty to allow the assistance that it has requested in this case. The United States Department of Justice obviously agrees. Such deference is a significant factor leading to our conclusion, a conclusion however which is also indicated by the entirety of the text of the Treaty, analogous cases, and application of the canons of treaty interpretation. For the foregoing reasons, we reject appellees' argument that the "law of the Requested State" should be read mechanically to incorporate all of the substantive law of the Requested State such that the foreign discoverability aspect of 28 U.S.C. § 1782 is incorporated; rather, we hold in this case that the language incorporates the procedural aspects of § 1782 for executing requests for assistance under the Treaty.

---

*id.* at 14–15. But, a careful reading of the entire case will show that the court held, consistent with our holding in this case, that the request under the self-executing treaty is not controlled by section 1782's substantive limitations. "Erato's second contention is that the original order compelling her to testify is invalid because it violates section 1782 . . . . While we doubt the force of Erato's

arguments under section 1782, existing law under section 1782 does not control this case." *Id.* at 15 (internal citation omitted). Therefore, not only is *Erato* distinguishable, as it involves a different treaty utilizing different language, but its eventual holding actually refutes the position taken by appellees in this case.

D. *Appellees' Other Contentions*

1. "Legally Applicable Privilege"

 Appellees also argue in their brief that they enjoy a privilege under Canadian domestic law to remain silent and refuse to give compelled testimony as a witness in a pre-charge criminal investigation. This argument is based upon the second paragraph of 28 U.S.C. § 1782(a) which provides that "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." The appellees correctly note that the legislative history makes clear that this language "embraces privileges recognized by foreign law." S. Rep. 1580, 88th Cong., 2d Sess. (1964), *reprinted in* U.S.C.C.A.N. 3782, 3790. Therefore, if this case involved a letter of request brought under 28 U.S.C. § 1782, then this court would have to ascertain whether the inability of a Canadian court in a domestic criminal pre-charge investigation to compel witness testimony amounts to a "legally applicable privilege" under Canadian law.

But we need not determine whether appellees had a "legally applicable privilege" under Canadian law. The Canadian request in this case was made pursuant to an MLAT rather than a letter of request under 28 U.S.C. § 1782. And for all the reasons already discussed in this opinion, we do not read the MLAT to incorporate and subject itself to the substantive law of the Requested State including 28 U.S.C. § 1782(a) and its "legally applicable privilege" limitation. Like the foreign discoverability requirement which, according to this Circuit, is an implicit part of 28 U.S.C. § 1782, at least with respect to letters of request and letter rogatory cases, the "legally applicable privilege" is an explicit part of section 1782 but does not control the resolution of this case for the reasons above discussed.

Our conclusion in this particular case is supported by the ratification history which provides that "[t]he parties agreed that questions concerning the applicability of privileges provided by the law of the Requesting State would be preserved for consideration by the courts of that State." Technical Analysis at 10. This, constituting the official executive branch interpretation of the Treaty, makes clear that the drafters did not intend to apply 28 U.S.C. § 1782(a)'s "legally applicable privilege" rule to MLAT requests and is entitled to considerable deference by this court. Without considering whether appellees would have a privilege under Canadian law, we reject the application of the privilege restriction to petitions by the Attorney General pursuant to his Treaty obligations and, consistent with the ratification history, leave this issue for the Canadian courts.

2. The Mere Utilization of 28 U.S.C. § 1782

 Any argument that 28 U.S.C. § 1782 and its foreign discoverability requirement applies simply because it was referenced in the subpoenas and utilized as the procedural vehicle in executing the MLAT request likewise fails. The MLAT is self-executing and this court is bound to give it effect as a law of the land without further legislation. "Procedural legislation which makes operation of a Treaty more convenient cannot amend or abrogate a self-executing Treaty." *Bishop v. Reno*, 210 F.3d 1295, 1299 (11th Cir.2000) (*quoting Cannon v. United States Dep't of Justice*, 973 F.2d 1190, 1197 (5th Cir.1992)). "A treaty, when ratified, supersedes prior domestic law to the contrary, and is equivalent to an act of Congress." *Xerox Corp. v. United States*, 41 F.3d 647, 658 (Fed. Cir.1994) (internal citation omitted). While 28 U.S.C. § 1782 may be utilized as the vehicle by which MLAT requests are

executed, the Treaty substantively stands on its own as a law and therefore such MLAT requests need not comply with the substantive restraints associated with requests made solely under 28 U.S.C. § 1782.

### E. *Trinidad and Tobago Distinguished*

In closing, we must emphasize that we have not abandoned this Circuit's holding in *Trinidad and Tobago*, 848 F.2d 1151, 1156 (11th Cir.1988). We in no way alter or amend its holding that letters of request made pursuant to 28 U.S.C. § 1782 in a criminal investigation require a showing that the information sought is discoverable in the foreign country. Nor could we as a panel do that in any event. *See United States v. Hogan*, 986 F.2d 1364, 1369 (11th Cir.1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled *en banc*, or by the Supreme Court."). This case is simply distinguishable as it involves an MLAT request rather than a letter of request under 28 U.S.C. § 1782. Because the MLAT obligates both countries to provide the assistance in this case regardless of whether the information sought would actually be discoverable in the requesting state, we find *Trinidad and Tobago* inapplicable.

### III. CONCLUSION

For the foregoing reasons, we hold that the information sought by Canada in this case, subpoena-compelled testimony pursuant to a Canadian criminal investigation occurring prior to the filing of formal charges, was within the scope of the two countries' obligations under the MLAT. Consequently, the subpoenas should not have been quashed. Accordingly, we VACATE the order of the district court quashing the commissioner's subpoenas.

On receipt of our mandate, the district court shall enter an appropriate order enforcing the subpoenas.

**VACATED AND REMANDED WITH INSTRUCTIONS.**